UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


                                  )
UNITED STATES OF AMERICA,         )
                                  )          Criminal Action
         Plaintiff,               )          No. 19-10107-DPW
                                  )
v.                                )
                                  )
JULIAN FIELD,                     )
                                  )
         Defendant.               )
                                  )


BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE


SENTENCING

May 21, 2021
3:00 p.m.


John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

1    APPEARANCES:

2    On Behalf of the Government:
     Anne Paruti
3    United States Attorney's Office MA
     1 Courthouse Way
4    Suite 9200
     Boston, MA 02210
5    617-748-3310
     anne.paruti.lohnes@usdoj.gov

6

7    On Behalf of the Defendant:
     Jessica P. Thrall
8    Federal Public Defender Office
     51 Sleeper Street, 5th Flr.
9    Boston, MA 02110
     617-223-8061
10   Jessica_Thrall@fd.org

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                       P R O C E E D I N G S
 2              (The following proceedings were held in open court
 3    before the Honorable Douglas P. Woodlock, United States
 4    District Judge, United States District Court, District of
 5    Massachusetts, at the John J. Moakley United States Courthouse,
 6    One Courthouse Way, Courtroom 1, Boston, Massachusetts, on
 7    May 21, 2021.)
 8   (Case called to order.)
 9              THE COURT:  Well, I understand that counsel are fully
10    vaccinated, as is the defendant, and so I'll permit you to
11    speak to the Court without the masks on.  And anyone else who
12    is fully vaccinated can take the masks off here.
13              I have a series of materials that I want to walk
14    through and make sure I have everything here.  I have a
15    Presentence Report dated revised as of May 18, 2020.  I
16    received an email -- Ms. Fox?
17              U.S. PROBATION:  Your Honor, the second addendum was
18    also, it was revised as of February 16, 2021.
19              THE COURT:  Okay.  I'm afraid I don't have that with
20    me.
21              U.S. PROBATION:  Barbara, do you have it?
22              COURTROOM CLERK:  What was the date?
23              U.S. PROBATION:  February 16, 2021.  I can try to find
24    it.
25              COURTROOM CLERK:  Is it just particular pages?
```

1              U.S. PROBATION:  It's the whole report.

2              THE COURT:  Does it just have a second addendum; is

3    that the only change in the report or not?

4              U.S. PROBATION:  One moment, Your Honor.

5              COURTROOM CLERK:  I have it.  Pages 22 to 24.

6              U.S. PROBATION:  But there was a paragraph 4, the face

7    sheet identified, dated page 2 and paragraph 4, so there are

8    changes to those.  So it would be page 1, 2 and 3.

9              THE COURT:  Let me take a look at the second addendum

10   first.  So the principal substantive change in here is that

11   paragraph 4?

12             U.S. PROBATION:  Yes, Your Honor.

13             THE COURT:  All right.  So in addition to now the

14   revised Presentence Report as of February 16, 2021, I have an

15   email from Ms. Fox concerning resolution of one of the cases in

16   the Concord District Court.  The other case is still

17   outstanding; is that right, Ms. Thrall?

18             MS. THRALL:  Your Honor, one of them has been resolved

19   by way of pros in the Concord District Court.  The other

20   remains open, and I will address that when we discuss the

21   sentencing.

22             THE COURT:  Well, let's talk about it for now.

23             MS. THRALL:  Sure.

24             THE COURT:  So as I understand it from Ms. Fox's

25   email, the matter that's touched on by paragraph 37, which is I

 1    believe the kidnapping or home invasion case, the range of

 2    cases has been resolved.  Is that right?

 3              MS. THRALL:  Yes.

 4              THE COURT:  And that's by a nul pros?

 5              MS. THRALL:  Yes, that's my understanding.

 6              THE COURT:  And then 38 remains open.  That's assault

 7    and battery of a person over 60 disabled.

 8              MS. THRALL:  Yes, that's my understanding.

 9              THE COURT:  Okay.  So then I have a victim statement

10    here dated as of or submitted as of December 17, 2019.

11    Although it appears to have been drafted more or less shortly

12    after the events themselves, and it includes as well an

13    additional set of documents described as a series of vignettes

14    written in the order that they occurred, and my recollection is

15    five days after the incident, which I guess supplements the

16    victim witness statement.  And then I was told by Ms. Beatty

17    that the victim has chosen not to be present here.  Is that

18    right?

19              MS. PARUTI:  That is true, Your Honor.  He has been

20    following the case very closely.  He has elected not to come in

21    person.  He's also elected not to observe by Zoom.  I spoke

22    with Ms. Mortellite and Ms. Beatty earlier.  He has asked my

23    office to provide him with a transcript of the sentencing

24    hearing so he can know exactly what happened, and I agreed to

25    facilitate that for him.

1          I believe it's been communicated to you that he has

2   asked me to read his impact statement in full.  I understand, I

3   would ask to read the initial part, what I think is truly the

4   impact statement.  I think the addendum to the impact statement

5   has been filed publicly.

6          THE COURT:  Well, I'll tell you, it's filed in a

7   redacted form.  The redactions seem to me to be of the victim

8   himself or the identification of the victim himself.  I've of

9   course read it and I don't see a reason to read it in open

10  court.  It's available.

11         MS. PARUTI:  And that's fine.  I told him that I would

12  ask that.  I do have, the victim in this case has asked me to

13  read another very short statement that he has not provided for

14  filing in writing.  So I would ask when the Court is ready to

15  hear that I'd be able to read that on his behalf.  I have

16  shared it with Ms. Thrall in advance of the hearing.

17         THE COURT:  Why wasn't it filed?

18         MS. PARUTI:  He asked for it just to be read.  He did

19  not ask for it to be filed in writing.  And we typically --

20  typically, especially where he's already filed something in

21  writing, we typically would accede to the request of a victim

22  in a case about how their statement is preserved or presented

23  to the Court.  And in this case he specifically asked to have

24  it read.

25         THE COURT:  Well, the office may have a position with

1    respect to that, but you also have an audience, specific

2    audience.  That's the Court.

3            And it seems to me that rather than raise this at the

4    last minute, irrespective of the fact that you apparently

5    shared it with co-counsel, that it should have been shared with

6    the Court to identify that there's something in addition.  Now,

7    is this a new document?

8            MS. PARUTI:  It is, yes.

9            THE COURT:  And what's the date of the new document?

10           MS. PARUTI:  I don't have the -- he submitted it by

11   email to a person from my office.  I don't have that with me.

12   I have it in a clean document in the format that I sent it

13   earlier today to Ms. Thrall and Officer Fox.  I can check for

14   the Court, but it was within the last day or two.

15           THE COURT:  You mean that it was sent to you?

16           MS. PARUTI:  Correct, yes.

17           THE COURT:  When it was created is unknown to you?

18           MS. PARUTI:  I believe that it was created, having

19   looked at the email in the form that it was submitted to the

20   victim representative in my office, I believe that it was

21   created in email form at the time that it was submitted to her

22   based on the email.

23           THE COURT:  When was that?

24           MS. PARUTI:  My memory, I would have to check my

25   email, but my memory is that it was a day or two ago.

```
 1              THE COURT:  Okay.  And so I'm clear on this, because
 2    I'm working off the documents themselves, the original victim
 3    impact statements appear to have been composed near the time of
 4    the incident.  Is that right?
 5              MS. PARUTI:  Yes.
 6              THE COURT:  Even though they were sent to your victim
 7    advocate on December 17, or at least they were submitted by the
 8    victim advocate on December 17 to the Court, December 17, 2019
 9    to the Court.
10              MS. PARUTI:  Yes.
11              THE COURT:  Okay.  Well, I think you should then read
12    the document now.
13              MS. PARUTI:  Absolutely.  It's addressed to Your
14    Honor.
15              It says: "To the Honorable Judge Woodlock.  I have
16    read Mr. Field's written statement to the Court concerning his
17    actions of February 3, two years ago.  I have also received a
18    heartfelt letter from Mr. Field directly to myself with his
19    apology.  I believe his apology is sincere, and I believe his
20    remorse for his actions is genuine.  I wish the Court to know
21    that I bear Mr. Field no ill will.  And on the contrary, I feel
22    a deep concern for the situation he now finds himself in.
23    Aside from his alarming and erratic behavior on that night in
24    question, I did not even then feel that he was a fundamentally
25    bad or violent person.  Despite his intense agitation at the
```

1    moment, he did show lenience to me, and he did express his

2    disinclination to engage in further violence referring to that

3    which had occurred before he arrived at my house.  I am

4    encouraged to know that he has been working seriously on

5    developing a positive state of mind, and he has my best wishes

6    and hope that in the time to come, he can continue making

7    progress in this direction and eventually re-enter the

8    community as a responsible citizen."

9           And as I said, that was submitted by email and he

10   signed his name to it.

11          THE COURT:  Okay.  That will be filed in court --

12          MS. PARUTI:  I will file it.

13          THE COURT:  -- filed on the docket of the court so

14   that it's available not merely to those who get a copy of the

15   transcript but to anyone else who is reviewing the materials

16   that were presented to me.

17          MS. PARUTI:  I will do that.

18          THE COURT:  And I would say, I mean, your office can

19   and does do what it wants in this regard, but frankly it's not

20   very helpful to do it in that fashion.  It doesn't serve the

21   people that you're purporting to speak for.  It doesn't serve

22   the public to have these last-minute materials brought out in

23   this fashion.

24          So if I have to start doing a procedural order that

25   requires the United States Attorney's Office to do what they

1    should do, I guess I'll do that in the future.  But I've had

2    this happen now a couple of times, and it doesn't advance the

3    purposes of victim impact dimensions to cases.  So perhaps

4    you'll pass that on.

5           MS. PARUTI:  I will, Your Honor.

6           THE COURT:  Okay.  So in addition to the victim

7    materials, I have as well a copy of the letter from the

8    Department of Mental Health, Northeast Region, particularly

9    from Dr. Mitchell, reviewing an appeal and indicating that the

10   Department of Mental Health is prepared to provide services in

11   this case, in the case of Mr. Field.  That's the letter of July

12   9, 2019 here, and it has attached as well the letter or a

13   memorandum of November 30, 2020.

14          In addition, I have a collection of letters that have

15   been submitted, two of them under seal, but they amount to --

16   they're in document number 71 and they run 63 pages of various

17   kinds of observations by various people concerning the

18   defendant here.  I do have the defendant's cover sentencing

19   memorandum.  And I have separately, they've been submitted

20   separately, a letter from Mr. Field to the Court itself

21   directed to me, and I think it's probably the same letter that

22   was directed to the victim from Mr. Field.  I'm sorry?

23          MS. PARUTI:  I was going to say, he authored a

24   separate letter to the victim that was provided to me by

25   Ms. Thrall.  The victim did read the submission.

1          THE COURT:  Is it any different from document number

2    71-7 which was a sealed document?

3          MS. PARUTI:  It is different from what I think

4    Ms. Thrall -- actually, if I may.  I have 71-2, which is the

5    allocution.  And if 71-1 is the document that begins, "Dear"

6    and then the victim's name, then that would be the same

7    document.

8          THE COURT:  And it is, it was filed under seal as

9    71-7, just so we're clear on what the documents are here that

10   have been filed in various ways.

11         MS. PARUTI:  So I would have to defer to Ms. Thrall

12   because when it was provided to me, it was not, it's not

13   appended with the docket number per se.  It was provided to

14   me --

15         THE COURT:  Have you looked at the docket?

16         MS. PARUTI:  I'm sorry?

17         THE COURT:  Have you looked at the docket?

18         MS. PARUTI:  I have.  I've reviewed all the materials

19   that Ms. Thrall submitted.

20         THE COURT:  No, no, no.  The docket itself.  There's a

21   docket in the case.

22         MS. PARUTI:  I understand that.

23         THE COURT:  And did you look at the docket in the

24   case?

25         MS. PARUTI:  I have looked at the docket in the case.

1          THE COURT:  And you have access to these kinds of

2     sealed documents on the docket, don't you?

3          MS. PARUTI:  I don't believe that by accessing the

4     docket and, for lack of a more eloquent term, clicking on the

5     blue link I do.

6          THE COURT:  Ms. Beatty?

7          (Discussion off the record.)

8          THE COURT:  Well, Ms. Beatty tells me that it's not

9     accessible to you.  So why don't you consult with Ms. Thrall or

10    maybe Ms. Thrall can represent whether this is the same

11    document that was filed under seal.

12         MS. THRALL:  Yes, Your Honor.

13         THE COURT:  Okay.

14         MS. PARUTI:  Thank you.

15         THE COURT:  So then I have the defendant's sentencing

16    memorandum and the government's sentencing memorandum.  Are

17    there any other written materials I should have here?

18         MS. THRALL:  Your Honor, I believe you did not mention

19    the other document that was filed under seal, the report of Dr.

20    Edersheim.

21         THE COURT:  I see, yes, I do of course have that.

22    Anything else?

23         MS. THRALL:  No.  Thank you.

24         THE COURT:  Now, Ms. Beatty said that there was a

25    desire to have someone speak.

1          MS. THRALL:  Your Honor, Dr. Edersheim and Ms. Heather

2     Hovley from the Department of Mental Health, they are both on

3     the Zoom.  They are prepared to answer questions if the Court

4     has any for them based on the written materials.  I am not

5     going to be asking them to speak unless the Court has specific

6     questions for them.

7          THE COURT:  Okay.  I think I will.  So I'll hear from

8     the government first as to your recommendation.

9          MS. PARUTI:  Thank you, Your Honor.

10          THE COURT:  And I guess I should, you know, clarify

11     what's known to the parties, that the guideline calculations,

12     which are not challenged in this case, are as follows:  108 to

13     135 months' incarceration, supervised release for a period of

14     two to five years, a fine, assuming that it's imposed, of

15     $30,000 to $250,000.  There is a mandatory special assessment

16     of $100.  We're dealing with the same set of numbers here.  Am

17     I correct?

18          MS. PARUTI:  Yes, Your Honor.

19          THE COURT:  Okay.

20          MS. THRALL:  Yes, we have no objection.

21          THE COURT:  So I'll hear from the government.

22          MS. PARUTI:  Thank you, Your Honor.

23          Your Honor, I want to just start off by acknowledging

24     that this is unlike -- the level of insight I think that the

25     defendant has shown into maybe the motivations of his crime,

1    although they seem on the surface pretty obvious, we're talking

2    about somebody who was frankly in the throes of drug addiction

3    which was compounded by or maybe caused by or at least

4    interrelated with serious mental health issues.

5         But also insofar as the effects of his crime on his

6    victim, I have to say that the level of articulation, of

7    eloquence and insight in his ability to articulate why what he

8    did is so bad is something that I haven't seen a defendant do

9    before either in federal court or state court.  I think he

10   knows that.  I think another piece of this that is truly

11   astounding to me is I think the grace with which the victim in

12   this case has also identified that and accepted that, and I

13   think that's also something that, with a crime this serious, is

14   pretty remarkable.

15        I know that you, Your Honor, are in a difficult

16   position because frankly Ms. Thrall has done a really good job

17   of painting a picture of her client.  Presumably he has been a

18   tremendous help in that regard because of the level of insight

19   and because of his apparent desire to fix what in some part led

20   him to that day.

21        And so I know it's a really difficult decision to

22   figure out what is the right number here, because that's sort

23   of what we come down to, and I think there is always, in almost

24   every single case, I think there's always a range of

25   punishments that can be very much at odds but also at the same

1    time equally reasonable.  And I think here, I'm not in a

2    position where I can say that a five-year sentence is

3    unreasonable; I can't say that.  I do believe that the sentence

4    the government is proposing is a reasonable one as well and is

5    warranted and frankly is necessary.

6         I think there are -- obviously every case has its own

7    dimensions.  That's why I think it's difficult when Ms. Thrall

8    was trying to say, "Okay, let's look at other kidnapping cases

9    we've had in this district."  It's really hard to compare.  I'm

10   going to be really clear that no person ever, regardless of the

11   situation that they're in, whether it's based on circumstances

12   or based on decisions they've made, no person ever deserves to

13   be victimized.

14        But when we are looking at -- trying to find, okay,

15   what is some level of parity that we can achieve in determining

16   an appropriate and warranted sentence here, I think it's hard

17   to look at what happened in other cases and figure out whether

18   Mr. Field should be sentenced at a pretty large variance from

19   what some others have or whether he should be looked at as

20   being on the same level playing field as others sentenced in

21   this district.

22        I think one thing, when you're looking at it through

23   that lens, that really stands out is that we're talking about a

24   person who was victimized in one of the most I think

25   frightening ways frankly at no fault of his own.  He was in his

1    home, which is a place where, objectively, we as a society

2    recognize that is maybe one of the only places we should and

3    can expect to be safe.

4         I think one thing that -- I know the Court has read

5    the victim's series of vignettes that he appended to his victim

6    impact statement.  One of the things that sort of struck me

7    when I was reading that and thinking about and trying to

8    understand what it would be like to be a person that was

9    victimized in that way is sort of the level of vulnerability

10   that he was able to portray and sort of explain when he's

11   talking about sitting by himself at night in the dark, in a

12   house by himself, sort of working out a form of art, playing

13   the piano, and then all of a sudden realizing that there has

14   been somebody in there who took great steps to make sure he

15   would be able to safely get in that house to target this person

16   by literally casing the house beforehand and sat there

17   intruding on one of those sort of strange private moments that

18   is supposed to belong to a person and to a person alone.

19        That in and of itself is a little bit jarring I think

20   for any person who lives in society, who has family but has

21   space to themselves that they hold as personal space.  But then

22   to be confronted with somebody who the victim in this case

23   perceived to be obviously suicidal and to be obviously, he used

24   the term "psychotic," but obviously under the influence of

25   something and desperate, that injects another level of terror

1    that is really hard to articulate I think and understand if you
2    haven't seen it before.
3          As practitioners we have seen it through other people
4    who have experienced it.  I think people who have experienced
5    it themselves can maybe empathize or understand what that
6    actually is.  And so I think that the victim impact statements
7    here really are quite valuable in this case in the way that
8    they're able to articulate that in a way that's understandable
9    to the rest of us who have to decide how bad was this crime.
10         And I think it goes without saying that this is a
11   nightmare for a victim in that position.  And this is one of
12   the more serious crimes that the Court will see.  And I think
13   that's something that is the driving force behind the
14   government's recommendation in this particular case.  Obviously
15   for a defendant who didn't have this sort of insight that
16   Mr. Field does and the desire to keep his drug addiction under
17   control, which was clearly spiralled -- I won't get into
18   details just because we're talking about sealed documents that
19   were filed, and the Court understands what sorts of drugs the
20   defendant was using, how that progressed to the time
21   immediately leading up to this particular episode.  Without
22   that level of insight, I might not be recommending a low-end
23   sentence because the violation is so grave.  But it is that
24   insight and it is that apparent at this time desire,
25   willingness to truly engage in the services that will be made

1    available to him that has --

2            THE COURT:  You say "the services that will be made

3    available to him."  What are they?

4            MS. PARUTI:  I'm sorry?  What are they?

5            THE COURT:  What are the services that are going to be

6    made available to him?  I assume you were talking about an

7    incarcerative setting.  He's been in an incarcerative setting

8    now for an extended period of time and does not appear to have

9    had services or meaningful services.  So going forward, what

10   are you talking about?

11           MS. PARUTI:  I expect that and -- you know, obviously

12   we are in a different time now.  In a pretrial detention

13   situation, there are obviously always going to be fewer

14   services available to an inmate or a detainee.  Obviously the

15   entire time that the -- well, COVID occurred while the

16   defendant was incarcerated.  That obviously has changed what an

17   incarcerative setting looks like.

18           I don't know when programs will be made available to

19   Mr. Field specifically.  I expect, though, that given the

20   length of sentence that will be imposed, whether it's five,

21   nine, something in between, something totally different, I

22   would expect that he would be able to avail himself of

23   substance abuse-related services in prison.  I would expect

24   that he would be able to continue to avail himself to mental

25   health services.  Obviously those services are going to have to

1    continue probably for -- well, at least for the term of

2    supervision once he's ultimately released from prison.

3          But I would presume for somebody with issues that are

4    described in the way they are for Mr. Field, both by counsel in

5    her written submissions but also in the documents upon which

6    she relies, for example, the psychiatric evaluation and some of

7    the other information from the defendant himself, I would

8    expect this would be a lifelong -- maybe "struggle" is too

9    pejorative of a term, but I think it frankly would be a

10   struggle for him for time to come.

11         THE COURT:  So then the difference between the two

12   recommendations is simply the length of incarceration.  Because

13   the limitation exists as to supervision, five years.  That's

14   the outside I can do.  And the assumption is that there will be

15   adequate services in the prison system.

16         MS. PARUTI:  So I guess the question is adequate

17   services to what end, for him to be able to continue to make

18   progress?

19         THE COURT:  Yes.  I would assume that's the goal here.

20   It's not merely to warehouse him.  So the goal is to provide

21   adequate services.  And "adequate" I assume covers a wide range

22   of concerns, not simply being present for 12 Step programs.

23   He's been present for 12 Step programs and chosen to take his

24   own steps away from them when they've been offered over a

25   period of time, an extended period of time here.

1           So the question I'm asking really has to do with how
2      it is that the prison system would facilitate his
3      rehabilitation speaking to something different from what the
4      victim impact statement speaks to.  I fully agree with you
5      about the victim impact statement.  It's why I like to have it
6      presented in a regularized way so that it's possible to
7      understand the different responses of the victim over a period
8      of time, and the same ones, because what you read is not very
9      dissimilar to more the short version of the victim impact
10     statement before.
11           I don't disagree with you.  This is as serious a crime
12     as imaginable or as serious a violation of another person's, I
13     guess the psychobabble is "space," using that as a kind of
14     bumper-sticker way of describing what's going on with this sort
15     of thing.  It's very serious.  That's one part.  That's
16     historical.
17           The second part is, looking forward, what do we do
18     with or for someone like Mr. Field going forward.  And that's
19     why I'm asking this question.
20           MS. PARUTI:  And I think it is with and for, and I
21     think --
22           THE COURT:  That may be fair.  Although, let's just
23     say that the "with" is historical and the "for" is
24     forward-looking.
25           MS. PARUTI:  So I think part of that is, like you

1  said, what can we do for him if we're looking forward.  And one

2  of the things we can do for him is making sure that he is

3  offered whatever services exist in the Bureau of Prisons

4  facility that he's at.

5          I can't -- I obviously cannot say that when he is

6  incarcerated he is going to get or have the opportunity to have

7  access to anything he wants; I can't say that.  I do know --

8          THE COURT:  Let's then look at the one professional,

9  formal professional submission that I have, which is from Dr.

10  Edersheim -- if I pronounce it correctly.  I have a hard time

11  pronouncing everybody's name.  Edersheim I guess is the proper

12  way to describe it -- in which she, in a measured way,

13  evaluates the kind of formal DSM categories and is only able to

14  or is only comfortable on the basis of what she has to say to

15  talk about polysubstance use disorder and borderline

16  personality disorder.  And her statement is he requires

17  intensive and simultaneous treatment and that it should be

18  undertaken with a caution against using psychostimulant

19  medications.  Is that what the Bureau of Prisons offers?

20          MS. PARUTI:  I can't speak at this point to -- I would

21  expect that if the Court made a recommendation to, for example,

22  you know, a federal medical center, they obviously are equipped

23  to --

24          THE COURT:  Would the security designation for someone

25  who uses a knife in furtherance of a kidnapping lead to

1    designation to a federal medical center?

2          MS. PARUTI:  I don't know the answer to that.  I

3    haven't consulted anyone from BOP on that particular question.

4    But I think that there is -- this doesn't answer your question,

5    so I don't know why I'm even going to say it.  The thing is

6    that there are inmates probably at every single institution who

7    suffer from some sort of mental health disorder at varying

8    levels.  Obviously I have no reason to --

9          THE COURT:  Well, that is no doubt true, although I am

10   trying to individualize the sentence.

11         MS. PARUTI:  I understand.

12         THE COURT:  And I'm somewhat familiar with the

13   formalities of the Bureau of Prisons' designation and their

14   programs and the availability of the programs here.

15         So maybe, Ms. Fox, can you answer the question?  Not

16   that you're designating, but what would the likely designation

17   be for someone like this?

18         U.S. PROBATION:  Your Honor, I would not, I do not

19   know the answer to that question.

20         THE COURT:  Can we get a preliminary determination

21   regarding that?

22         U.S. PROBATION:  I could ask someone from the Bureau

23   of Prisons.

24         THE COURT:  Okay.  I think that's going to be

25   something I'm going to be interested in, particularly here,

1    because I would like to hear from Dr. Edersheim further on

2    that.  But that's really what I'm looking at.

3         I don't necessarily believe that the prosecution

4    function includes being familiar with the variety of ways in

5    which mental health can be treated in the Bureau of Prisons,

6    although it is something that is going to be critical to me.

7         You've talked about the one most important aspect of

8    this, which is the seriousness of the offense, that can't be

9    understated and the anxious apprehension I suppose that I can

10   say the victim has under these circumstances.  That's a

11   specific deterrence kind of question.  I wonder about how

12   responsive a sentence in this case would be to concepts of

13   general deterrence.  It seems to me to be not a general

14   deterrence kind of crime.

15        MS. PARUTI:  So I think -- and that's why, you know, I

16   started off by saying what is driving this is, for the

17   government, one facet of a sentence in that it is a punishment

18   that is commensurate with the seriousness of a crime.  I think

19   that the Court is right in assessing a crime like this that is

20   often, for somebody like Mr. Field, it is a crime that is born

21   out of sort of a confluence of circumstances, which are I think

22   here primarily fueled by drug addiction and substance abuse and

23   mental health issues that are obviously, like I said,

24   compounded by that drug addiction.

25        In general, I think a serious sentence for a

1   kidnapping with a knife I think does have some deterrent

2   effect.  I agree with you that when you're looking at an

3   individualized person like Mr. Field --

4          THE COURT:  When you say that, take a look at the

5   sentence and all that we know about it -- take a look at this

6   offense and all we know about it.  Do you think that saying,

7   "Actually this is not a 60-month case, it's a 108-month case,"

8   has an identifiable general deterrent effect?

9          I mean, it's not as if saying 60 versus 62, we have to

10  draw a line somewhere.  Now we're talking about difference

11  between the recommendations of the parties.  60 months versus

12  108 months.  Is that visible to the eye of a potential offender

13  that has been affected as Mr. Field was affected?

14         MS. PARUTI:  So for somebody in the community who

15  might be in a position to commit a crime like this, because of

16  circumstances like Mr. Field, I would say no.  I think if

17  you're looking at a true generalization, so for example, the

18  news comes out, "A man from Massachusetts was sentenced today

19  to nine years in prison for kidnapping a stranger out of that

20  stranger's home with a knife, the defense asked for five years,

21  the Court imposed a sentence of nine years," a lot of that

22  depends on who has access to that news, clearly, but I think

23  that's a message that is important.

24         THE COURT:  But is that what general deterrence is

25  supposed to do under these circumstances, that is, divorce

1    itself from the particular circumstances of the individual

2    defendant?  Perhaps that is true.  Perhaps general deterrence

3    is just the kind of looming consequence addressed to people who

4    would otherwise obey the law or at least obey the law at

5    something at the 108-month --

6            MS. PARUTI:  I think -- sorry.

7            THE COURT:  You know, I'm not trying to torment you.

8            MS. PARUTI:  No, I understand.

9            THE COURT:  I really am trying to get to what is it

10   that we're trying to do under these circumstances.  And each

11   one of these elements has to be examined I think carefully to

12   say society is entitled to have the Court express denunciation

13   of the crime.  There was a Victorian judge and a penologist as

14   well, historian of criminal law, who once said that the

15   sentence is like a seal to hot wax.  It takes a transitory

16   substance and creates a specific recognition of what it stands

17   for.  All to the good, although somewhat imagistic.

18           But I want to be sure I understand what general

19   deterrence is directed at.  And what you seem to be saying is

20   general deterrence is directed at everybody in the population

21   who might look at this and say, "Gee, I might want to commit

22   kidnapping with a knife sometime, but 108 months is not worth

23   it."

24           MS. PARUTI:  So I think from a general deterrence

25   perspective, I think we're not talking about the community at

1    large.  I think we're talking about -- well, the way I see it

2    is we're talking about, especially when, like I said, if you're

3    talking about somebody who is situated like Julian Field, I

4    think that is one segment of that population.

5           The other segment of the population is, for example,

6    the types of defendants who we see in the other cases that were

7    mentioned by Ms. Thrall and then by the government.  When we're

8    talking about -- because really when you're talking about

9    deterrence, you're not talking about somebody who has no

10    inclination toward criminality at all because that's not a

11    person or subset of people of our community that needs to be

12    deterred.  I think what you're talking about is the subset of

13    the community that is inclined towards a similar type of

14    criminality.

15           So, for example, if you have somebody who is, for

16    example, in one of these other cases, and -- because every step

17    in taking one of the cases that's cited in the briefs, for

18    example, you're talking about somebody who is overseeing a

19    gambling operation and who uses violence to enforce his

20    operation, and you have a victim or you have a participant who

21    is beholden to that person for money who enters into that

22    relationship understanding that if he doesn't pay this person

23    back that something bad might happen to him.  That person, that

24    person running the gambling operation, when he is determining

25    how he's going to enforce it, is he going to stop and say,

1   "Now, I know Judge Woodlock imposed 108 months in that other

2   case.  I don't want that to happen to me.  Instead of taking

3   him away to some other place with a knife, I'm just going to

4   beat him in this parking lot"?  I don't think, I mean,

5   realistically that's not what's going on.

6          But I think there is some expectation that when people

7   are making decisions to commit crimes, which is -- when people

8   are making decisions to commit specific crimes, there's an

9   understanding that, one, what you're doing is wrong

10  fundamentally, and that, two, certain behavior is punished

11  differently by the courts for different types of aggravating

12  factors.  We know that because we see that played out in all

13  types of circumstances.

14         For example, when gangs use juveniles to commit

15  certain violent crimes because they know -- they pay attention

16  to what happens in the courts.  They know that a juvenile is

17  going to be sentenced differently for using a firearm than, for

18  example, a 19-year-old.  So I think --

19         THE COURT:  So I guess, not to interrupt you but just

20  so I can focus the thought, you are saying that whatever the

21  population is, it's broader than those who may be impelled by

22  or predisposed by mental illness to commit a crime like this.

23  It's directed at a broader group of people.

24         MS. PARUTI:  Absolutely, yes.

25         THE COURT:  Okay.

1          MS. PARUTI:  And, you know, I take your point, Your

2     Honor, again, general deterrence is a factor that you have to

3     think about.  Obviously you're directed to do that.  And it is

4     important to understand sort of where you're coming from,

5     obviously.

6          And I think again, Mr. Field is situated very

7     differently than some other people who commit the same type of

8     crime, but we do have to look at all those people who might

9     commit that type of crime.

10         The other thing that I think bears mentioning I guess

11    or recognizing is in the victim's sort of understanding as it's

12    elucidated through his written submissions is sort of the

13    difference between a sentence commenting on who this person is,

14    who this defendant is and what he did.

15         And, you know, I know that it doesn't often get

16    communicated to victims -- excuse me -- to defendants but the

17    government understands that distinction as well.  I'm not in

18    here asking for a longer sentence than Ms. Thrall because I

19    think Mr. Field, as you said, needs to be warehoused, he's a

20    bad person, whatever.  It's because I cannot -- well, I think

21    it is necessary and it's warranted to have that type of

22    response to the behavior that Mr. Field committed here, and I

23    think he understands that, too.  And one of the I think letters

24    that were submitted on his behalf -- I don't remember who the

25    author was, I can go back and find it after, there are

1   voluminous submissions.  But in one of the letters the writer

2   talked about candid conversations that that person had with

3   Mr. Field while he was incarcerated, since he had been detoxed,

4   since he had time to be a little introspective about it and how

5   Mr. Field anticipated that he would be facing a long sentence,

6   longer actually than the government is recommending and how he

7   was coming to terms with that.

8         And I think it's important to see that evolution of a

9   person who did commit the crime and who does understand that

10  the punishment, a punishment even more severe than the

11  government is recommending, is commensurate with the crime that

12  he committed.  And I think that is, again, a type of insight

13  that the government, maybe the Court has the benefit of seeing

14  that sometimes, but speaking for myself, I haven't had the

15  benefit of seeing that through a defendant's own words and

16  eyes.

17        And I think here, you know, I think Mr. Field when

18  he's expressing that to people he trusts, I think he's right.

19  There has to be a response that is commensurate that does not

20  go too far.  And I take your point that services may be limited

21  based on where he's designated to, but I think here we're

22  talking about a defendant who is willing to avail himself of

23  whatever services that are available to him in whatever

24  facility he goes to and thereafter.

25        That's actually why I'm recommending a lengthier term

1    of supervised release.  The guideline range I guess is two to

2    five years following his term of incarceration.  I think with

3    the mental health and polysubstance abuse issues that are

4    clearly present and have been present in his life for a very

5    long time, although he's young, I think that his best chances

6    for success after a term of prison, especially one that I think

7    necessarily should be long -- and, you know, "long" is

8    subjective, but objectively, the sentences we're talking about,

9    I don't take a five-year sentence lightly.  I know that is a

10   long time.  He has been incarcerated for over two years.  That

11   is a long time.

12          But the reality is, like you said, what do you do

13   with, to, for a person who breaks into an elderly man's house

14   with a knife and drags him across state lines, through a strip

15   club, makes him participate in acquiring drugs in public and

16   has a man sitting there wondering if he is going to die.  And I

17   think the answer to that is, in this case, it's a guideline

18   sentence.

19          THE COURT:  All right.  Thank you.  So, Ms. Thrall.

20          MS. THRALL:  Thank you, Your Honor.  I'd like to start

21   by saying it has been a real privilege to both figuratively and

22   literally sit beside Julian Field as he's gone through this

23   journey of having been arrested, detained, facing this charge

24   in the wake of having committed this offense, sitting and

25   talking with his family at length and also working with all of

1    the people who submitted the letters on his behalf and working

2    with Dr. Edersheim and Hovley throughout this case.

3            He has really, more than many people I've ever met,

4    tried incredibly hard to understand his own actions, to

5    understand how his actions have affected others and to look to

6    his future while also looking at a lot of uncertainty in terms

7    of what sentence would be imposed in this case.  We are asking

8    the Court to consider a sentence of 60 months with supervised

9    release to follow.

10           THE COURT:  So let me ask you -- perhaps I would

11   suspect that you have a pretty good take on this, but I'll ask

12   Probation if it's necessary.  What's the release date on your

13   proposed sentence?

14           MS. THRALL:  If it was a 60-month sentence, Your

15   Honor?

16           THE COURT:  Yes.

17           MS. THRALL:  So I would think maybe 2023, I'm thinking

18   about four years from --

19           THE COURT:  Ms. Fox?

20           U.S. PROBATION:  Sorry, Your Honor, can you ask that

21   question again?

22           THE COURT:  What would the projected release date be

23   for the defendant, assuming he gets credit for the time that he

24   has spent in detention?

25           U.S. PROBATION:  Give me one minute, Your Honor.

1          THE COURT:  Yes.

2          MS. THRALL:  Your Honor, I'd like to revise my answer

3   based on talking to Mr. Field as well.  Because he has two

4   years of credit, we would anticipate almost maybe ten months

5   worth of good time.  And so I think that that would put us

6   closer to 2022.

7          THE COURT:  And he received good time even with the

8   violations or with the misconduct at Cedar Junction?

9          MS. THRALL:  I believe he will receive the good time

10  so long as he doesn't have any future disciplinary infractions

11  in the Bureau of Prisons.

12         THE COURT:  Okay.  So the Bureau of Prisons assumes

13  good time based on the prior incarceration, irrespective of how

14  fraught that might have been?

15         MS. THRALL:  I believe so.

16         THE COURT:  Okay.  Ms. Fox.

17         U.S. PROBATION:  Yes, I believe she's accurate.  Yes,

18  Your Honor.  And just to back up what Ms. Thrall said, I do

19  believe she's correct in regards to the disciplinary incidents

20  prior to being in BOP custody.

21         THE COURT:  So that would be late 2023?

22         U.S. PROBATION:  Yes.

23         THE COURT:  Okay.  Go ahead, I'm sorry.

24         MS. THRALL:  Thank you.  I'm happy to take any

25  questions, Your Honor, always.

 1          So I think the Court can see from Mr. Field's

 2     submissions the amount of time and energy that he has invested

 3     in trying to atone for what he did with a very specific

 4     acknowledgment that he may never ever make everything, you

 5     know, right for the victim in this case.

 6          And we have sat and talked about the seriousness of

 7     this charge and tried to weigh what would be an appropriate,

 8     reasonable, effective sentence in light of the seriousness of

 9     the offense.  And the questions that you've posed to the

10     government hit on a lot of the issues that we've talked about

11     in terms of what will happen to Mr. Field during his

12     incarceration, what are his goals, what will allow him to

13     re-enter society whenever he is released from prison as a more

14     whole substantial person than he was when he was arrested in

15     February, March of 2019.

16          So to that end, we sort of started this journey by

17     connecting Mr. Field with services from the Department of

18     Mental Health.  This on its own was incredibly challenging.  We

19     submitted the application for Mr. Field to receive services to

20     DMH.  We were initially denied.  We appealed that decision

21     because he needs the services.  And we wanted the services to

22     be available to him whenever he may be released.

23          We appealed that decision and we were eventually

24     connected with Ms. Hovley who has made what I consider to be a

25     pretty tremendous offer, which is an offer to connect and

1    continue with Mr. Field during his term of incarceration at the

2    Bureau of Prisons, to be willing to connect with his

3    caseworker, work around his release planning and be present

4    with him upon his release so that there is a continuity of

5    services available for him.

6          One of the components of Dr. Edersheim's ideas for

7    what Mr. Field may need upon release is the potential for a

8    residential setting, a residential dual-diagnosis setting where

9    he can live in -- like the Department of Mental Health has

10   facilities.  They have respite facilities.  They have respite

11   homes where people can reside.  They have around-the-clock

12   staff from DMH who can assist with medication compliance, who

13   can do drug testing.  That is the kind of place that Mr. Field

14   should be someday released to.

15         And I want to pause there to take up a couple of

16   issues related to his point system and what's going to happen

17   at the Bureau of Prisons because these two things I think are

18   very closely related.  So Mr. Field has calculated his points.

19   He thinks that he's going to have about 24 classification

20   points.  He thinks that that will make him eligible for a

21   penitentiary.

22         I think that this is relevant particularly in light of

23   the fact that one of the cases in Concord remains open, and

24   I'll talk a little bit about that background in a second.  But

25   the fact that that case is open is going to dramatically

1   interfere with the ability of the Bureau of Prisons to work

2   with Ms. Hovley and for that release planning to take place.

3            With an open case, a person, even if they're not in a

4   penitentiary, a person cannot, for example, go to the Coolidge

5   House.  Now, I don't know that Mr. Field should go to the

6   Coolidge House.  But what I envision is an opportunity for

7   Ms. Hovley to coordinate with Mr. Field's case manager at the

8   Bureau of Prisons to say this is what the Department of Mental

9   Health can offer him, this is the type of respite facility we

10  think we can place him in and let the Bureau of Prisons make a

11  decision about whether they would be willing to release him to

12  that location.

13           Having Mr. Field in a penitentiary, having Mr. Field

14  have an open case makes all of that tenuous.  And it makes it

15  tenuous for a couple of reasons.

16           THE COURT:  Well, let's pause with that.

17           MS. THRALL:  Sure.

18           THE COURT:  So what you say is my experience.  So what

19  can be done about that?

20           MS. THRALL:  So the government and myself -- well,

21  myself through the government had believed that both of the

22  Concord District Court cases were going to be dismissed.  There

23  was some level of miscommunication in the state courts.  One of

24  them was dismissed by way of nul pros because that case has the

25  same named victim as our case.  The other case has Mrs. Rachel

1  Field as the named victim.

2         The Concord District Court District Attorney's Office,

3  as is their right, has taken the position that they want to see

4  what happens here before they determine whether or not they

5  will dismiss that case.  The government has communicated in

6  consultation with me the grave concerns that I have about what

7  will happen for Mr. Field in practical terms if that matter

8  remains open.  Mrs. Field has communicated to the District

9  Attorney's Office her desire to have that matter dismissed

10  because of all of these complications.

11         We can't control what they do, Your Honor.  If the

12  case remains open, it remains open.  I have contemplated

13  calling Marian Ryan.  I have contemplated a lot of different

14  steps here.  My hope is that after a sentence is imposed here

15  and the District Attorney's Office in Concord sees that there

16  is finality here and I think, importantly, sees the scope of

17  the supervised release that will be imposed -- scope in terms

18  of requirements for treatment, not just length, once they see

19  that and that there is this plan in place for Mr. Field, that

20  they will be willing ultimately to dismiss the charges.

21         THE COURT:  Okay.  Let me interrupt.  And you'll of

22  course continue with other things that you want to bring to my

23  attention.  But let's assume that it's taken off.  We're still

24  talking, if not a penitentiary, we're talking at a fairly high

25  level of designation for this.

1          MS. THRALL:  Yes.

2          THE COURT:  And I question, for example, whether the

3    RDAP program would be available for him.  That's perhaps the

4    most effective program, at least that I understand, in the

5    Bureau of Prisons.

6          MS. THRALL:  I have had that question and conversation

7    with him myself.  Certainly if the case is open, he will not

8    RDAP.  If the case is not open, then the RDAP program, my

9    understanding is, has been relaxing some of the requirements

10   because of availability and access and reaching the right

11   people I think.  And certainly Mr. Field is one of the people

12   who would need this program the most.  My hope is that he's

13   able to do that.  The uncertainty around whether he will

14   participate in RDAP is I think a factor for the Court to

15   consider in setting an appropriate sentence here.  The

16   conditions that he will experience generally either in a

17   penitentiary or because of COVID, all of that is fair for the

18   Court to consider.

19          There is sort of another factor here related to

20   Mr. Field's success.  Let's assume for a second that he is in a

21   penitentiary, which I think is likely, at least to start out

22   with.  The other thing that's going to happen there is a

23   tremendous level of violence that could be inflicted upon

24   Mr. Field directly or that could be occurring in the prison

25   generally.  And what happens then are regular sort of rolling

1    lockdowns.  That's been happening more often because of COVID.

2    But even before COVID, it would be very routine for the

3    penitentiaries to be on lockdown because of violence in the

4    prisons.  And all of that violence, all of those lockdowns

5    pause the programming periodically.  So you don't get to have a

6    continuous program through RDAP if you're sort of in and out

7    and locked in for various periods of time.

8           I just offer that to the Court because I think that

9    that's probably where Mr. Field is going at least initially and

10   certainly if that case is not closed relatively soon.

11          THE COURT:  All right.  So let me ask whether or not

12   there have been communications between Dr. Edersheim -- is that

13   the -- Edersheim is the proper way to pronounce it, okay, and

14   Ms. -- I'm sorry.

15          MS. THRALL:  Hovley.

16          THE COURT:  I mean, the appeal document from DMH and

17   more specifically the document from November 30, 2020, which

18   talks about the various offerings that DMH has, does not sound

19   as precise as what Dr. Hovley -- or Ms. Hovley is talking about

20   here.  Is there any protocol plan that she has?  And has she

21   communicated it or had an opportunity to communicate with Dr.

22   Edersheim on this?

23          MS. THRALL:  I do not believe that Dr. Edersheim and

24   Ms. Hovley have directly talked to one another.  My view of

25   their recommendations and Dr. Hovley's -- Ms. Hovley's

1   willingness to collaborate with the Bureau of Prisons

2   caseworkers, my impression is that their recommendations match

3   in the sense that Dr. Edersheim is recommending that Mr. Field

4   have a residential placement and Ms. Hovley is ready, willing

5   and able to work with the caseworkers at the Bureau of Prisons

6   to make sure that type of residential placement is available as

7   an option for the Bureau of Prisons to release Mr. Field to.

8        THE COURT:  Let me pause for a moment.  Ms. Fox, what

9   experience has Probation had with Department of Mental Health

10  in this area?

11       U.S. PROBATION:  Your Honor, only because of my

12  experience, I haven't worked on the supervision side of it, I

13  don't have any experience with the Department of Mental Health.

14       THE COURT:  I understand, I understand the limitations

15  you might have.  Ms. Thrall.

16       MS. THRALL:  Thank you, Your Honor.  I can share two

17  situations from state court where I had clients who I referred

18  in to DMH services and both of whom were ultimately released

19  from prison facilities into DMH respite beds, and they were

20  supervised through state court probation.  I was imagining that

21  it was going to operate in a similar fashion in the federal

22  court, although I have not had a federal client experience

23  that.

24       THE COURT:  Well, it's a question of pass-off between

25  Bureau of Prisons and Probation.

1          MS. THRALL:  And I imagine that we have an opportunity

2     here with Ms. Hovley's involvement.  And her involvement has

3     been enthusiastic.  I have spoken to her on many occasions,

4     updated her on the pending sentencing.  I have met with her,

5     talked with her, tried my best to keep her in the loop.  And I

6     expect that that is available to Mr. Field through the duration

7     of his prison sentence, and I expect that Ms. Hovley will

8     confirm that if the Courts wants to talk to her about it.

9          THE COURT:  Okay.

10          MS. THRALL:  I think ultimately with all of these

11     topics, our hope collectively is that Julian Field comes out of

12     federal prison in a better place than when he was arrested, and

13     that's the goal.

14          And one of my concerns with an incarcerative sentence

15     beyond 60 months where so many of these factors, the

16     penitentiary, the caseworker, the services that he may have,

17     the medication that he may have, the lockdowns that he may

18     experience, so many of those things are unknown to us and

19     unknowable.  The longer he is incarcerated, the greater the

20     risk of those unknowable factors having really severe impact on

21     him.

22          The longer he is incarcerated, the more difficult it

23     is for Ms. Hovley to stay connected with the caseworker.  The

24     longer he's in a penitentiary, the harder it is for her to stay

25     in touch with him or in touch with the caseworker.  Everything

1   exponentially has the capacity to get worse and leave him in a

2   worse position than when he was arrested.  And that is

3   ultimately I think all of our goals, is to have him come out of

4   this incarcerative sentence in a better place.

5          THE COURT:  Okay.  So let me ask you about the records

6   from Wyatt of his adjustment.

7          MS. THRALL:  Yes.

8          THE COURT:  I'm somewhat familiar with how you read

9   these records, but these are not hassle violations.  These are

10  repudiations of authority, straight out.  And what am I

11  supposed to make of that?

12         That is to say, Mr. Field professes to have moved

13  along, and it appears that all of his professions are in good

14  faith.  On the other hand, here I have it as a series of

15  problems at Wyatt that sent him to Cedar Junction in which he

16  has an assault on a staff officer.

17         MS. THRALL:  Yes, I understand, Your Honor.  He has

18  had a hard time.  He's had a hard time at Wyatt.  He's had a

19  hard time adjusting.  There have been a lot of changes to

20  Julian's medication during the time that he was at Wyatt.  I

21  was in regular contact with the mental health staff at Wyatt

22  throughout the last two years about those changes.

23         And I talk about this in my sentencing memo a little

24  bit.  He has overreacted to situations.  He has tried his best

25  to cope with an incredibly stressful situation, and I

1   absolutely do not deny that there have been bumps in that road,

2   that he has had challenges there, and he has been very frank

3   with me about it and really is trying to do better, but this is

4   going to be a long-term process for him.

5          I do think that the change from Wyatt to Cedar

6   Junction has been an incredible improvement.  He has, at Cedar

7   Junction, he has a single cell.  Things there are less chaotic.

8   He has had, as far as I know, zero problems at Cedar Junction.

9          THE COURT:  Except for an assault, right?

10         MS. THRALL:  No, Your Honor.  That occurred at Wyatt,

11  and that is what precipitated the transfer to Cedar Junction.

12         THE COURT:  Okay.

13         MS. THRALL:  And my understanding, I spoke to the

14  warden about that interaction, and I don't believe any charges

15  are being brought, and the records reflect that Mr. Field

16  himself was pretty significantly injured during that

17  interaction.

18         THE COURT:  So let me ask about Cedar Junction.  It's

19  single-cell, which is lockdown, right?

20         MS. THRALL:  It is not -- it is single-cell.  It is

21  not always a lockdown.  It was for periods during quarantine,

22  but it is not --

23         THE COURT:  How many hours a day is he out of the

24  cell?

25         MS. THRALL:  Let me ask.

1          THE COURT:  How many hours a day is he out of the

2    cell?

3          THE DEFENDANT:  I'm only out of the cell for two hours

4    a day.

5          THE COURT:  That's the functional equivalent of being

6    in the hole.  So I mean, I can make a positive argument about

7    it.  On the other hand, it cuts in different sorts of ways I

8    suppose.  Okay.  Go ahead.

9          MS. THRALL:  So I believe that I already talked about

10   the work that we did getting Mr. Field assessed and accepted

11   into DMH.  After we did that, then we entered into this

12   evaluation stage with Dr. Edersheim, and that offered Julian an

13   opportunity to do a lot of self-reflection, a lot of

14   introspective work about why he committed this crime, how his

15   behavior affected the victim, how his behavior affected his

16   mother, how his behavior affected all of the people who wrote

17   these letters.  And I don't think I acknowledged this already.

18   I think there's 45 people who are watching the Zoom right now,

19   Your Honor.  His behavior has affected each of these people.

20          And the report from Dr. Edersheim, our hope is that it

21   synthesizes the history of his treatment with a forward-looking

22   plan that could be adopted in whole or in part by the Court as

23   conditions of supervision.  All of those things allowed Julian

24   to look at what his future will need to be in order to succeed

25   during his period of supervision and, frankly, throughout the

1    course of the rest of his life.  Whatever he undertakes, he is

2    going to have to do it forever, and he is going to have to do

3    it because he wants to do it, not just because he's on

4    supervision.  And having the ability to talk to Dr. Edersheim

5    about what happened and what needs to happen in the future has

6    allowed a lot of the growth and progress that the Court I hope

7    can see in Julian's interactions with the victim in this case.

8          So I'd like to talk for a minute about the way that

9    the interactions with the victim progressed and the way that

10   Julian's insight into his experience I think also progressed.

11         My office interviewed the victim at some point during

12   the pendency of the case.  And when we talked to him, he

13   indicated a desire to hear something from Julian.  Because of

14   that, I encouraged and Julian happily wanted to write an

15   apology letter to the victim.  That is one of the exhibits that

16   we have shared with the Court under seal.  We shared that

17   apology letter with the government rather than directly to the

18   victim, so the victim witness advocate from the U.S. Attorney's

19   Office shared Mr. Field's apology letter directly to the

20   victim.  And I believe that apology letter is what then caused

21   the victim to respond and submit the second submission that we

22   got yesterday or earlier today, describing his receipt of that

23   letter and what it meant to him.

24         And I think that both of these people, the victim and

25   Julian, have been able in their own way and on their own path

1    to heal from what happened that night.  And I wanted the Court

2    to have that information because I was concerned that you may

3    hear the second submission from the victim and think that

4    Julian wrote to him directly, and I wanted to make sure that

5    you knew that that did not happen.

6            THE COURT:  Well, I mean, I feel a little bit like a

7    schoolmarm in the way in which I've treated your sister and

8    you.  On the other hand, this kind of communication without

9    bringing the Court into it or exposing the Court in a way is

10   problematic to me, even with a victim who understandably has

11   concerns about ensuring the integrity of his space, but the

12   question of Restorative Justice is of course looming in all of

13   this, and that is not switching a light on and off immediately.

14   And the trajectory of the communications are something that are

15   a matter of some real concern to me and how they take place.

16           So I've got more information now, and no doubt I will

17   sooner or later be able to see it in writing and make some

18   judgments about it.

19           MS. THRALL:  Sure.  I wanted the Court -- I only got

20   that second submission from the victim.  I learned about it

21   yesterday, and I got the actual document today.

22           THE COURT:  No.  I understand the range of this.  On

23   the other hand, no one on either side should labor under the

24   assumption that I like learning about things when I'm on the

25   bench, particularly in a matter as serious as this, serious in

1    all the broadest possible ways, of fashioning a proper sentence

2    for the defendant, vindicating the public interest and all of

3    which, in my conversation I mispronounce yet another name --

4    Ms. Paruti, did I get that one right, Ms. Paruti?

5              MS. PARUTI:  It is.

6              THE COURT:  Oh, pure coincidence.

7              MS. PARUTI:  I think it's phonetic.

8              THE COURT:  Perhaps.  But these are all

9    incommensurables.  I mean, we talk about the considerations for

10   section 3553(a).  They talk in different directions.  They are

11   not consistent.  They're not linear.  They don't work that way.

12   They are a matter of judgment, and making a judgment requires

13   thinking about things at some length.  And I'm less interested

14   in -- and I don't suggest that that's what's happened here --

15   less interested in the adversarial aspects of it but in

16   understanding the full range of matters that I should have

17   before me.

18             It's why I found in one of the more recent but not

19   most recent U.S. Attorney's Office administrations it's so

20   frustrating when they simply couldn't engage or didn't

21   authorize the resistance to engage in the kind of conversation

22   that Ms. Paruti and I had.

23             We're trying to work this out, or at least you're

24   trying to inform me about how I should work it out, and I want

25   to help on that.  So that's why I raise this question.  But I

1    think we're past that part of it.  So, go on.

2         MS. THRALL:  Sure.  And when I talked at the beginning

3    about the journey that Mr. Field has been on through all of

4    this, this last piece, the apology letter to the victim and for

5    Julian today to be able to read that the victim got his letter

6    and was able to appreciate what he said and absorb what he

7    said, this is all part of the journey, and I'm not really even

8    sure that it ends today.  I think that based on Julian's

9    thoughtfulness and deep reflection about what he's done and

10   what he needs to do in the future, this does not end today

11   regardless of what sentence the Court chooses to impose.

12        So the last sort of area that I'd like to talk about

13   is Julian's life before this incident occurred.  And I tried my

14   best to be able to document it for the Court and to be able to

15   give the Court some better understanding of who Julian Field

16   was before this incident, and his caring for people, his

17   ability to connect with people who are experiencing significant

18   hardship, his intellect, his love for art and culture is so

19   deep and very beautiful and something that makes me feel that

20   he has so much to offer.  And it's part of why an incarcerative

21   sentence feels very hard to imagine for him.  And yet he gets

22   through his time in prison as best he can.

23        He is a voracious reader.  He is trying to stay up to

24   date on the news and talk to his friends and his family about

25   his goals and his dreams and his interests.  And all of that

1    comes through in a very profound way when you look at the

2    letters from his friends and family.

3          I think about the effect he had on the two Cooperman

4    sisters who he cared for their mother in the last year or last

5    few months of her life.  That relationship he had and what he

6    offered to that family is irreplaceable.  And I think the same

7    when I think about what he did for his friend Gabe's father

8    when he was diagnosed with ALS.  The stories that come through

9    these letters are so consistent of a very caring, thoughtful

10   young man that it has been so shocking for these people who saw

11   this side of Julian to now understand fully and to be watching

12   this Zoom and listening to all of this.  The idea that Julian

13   would inflict harm, physical harm or emotional harm on anyone

14   has been really inconceivable for most of the people who wrote

15   these letters.

16         And that's why when I'm thinking about in terms of

17   what do we need to do here in terms of what kind of sentence

18   should be imposed here, it's hard for me to imagine a lengthy

19   prison sentence, when underneath the behavior in February of

20   2019 is just this incredibly thoughtful, caring, loving young

21   man who has a lot to offer his community and his family.  He is

22   a person who is in Guatemala volunteering.  He is a person --

23         THE COURT:  Well, he's in Guatemala volunteering and

24   also deepening his involvement in controlled substances.

25         MS. THRALL:  Sure, yes.  These things are happening on

1    a parallel track, and they're happening on a parallel because

2    on the one hand, volunteering, caring for other people is very

3    much at the core of Julian's personality, and at the same time

4    he is deeply struggling with mental illness.

5           And one of the issues that Dr. Edersheim identified as

6    what was missing from some of the treatment that he received

7    before was the interrelationship between the substance abuse

8    treatment and the mental illness.  Because the substance abuse

9    was so rampant, it often masked the symptoms of the mental

10   illness, and the people who were treating him, particularly at

11   McLean, were focused so much more on the substance use rather

12   than the co-occurring mental illness.

13          And Julian owns responsibility for this, right,

14   because he was abusing the substances, but it created a

15   diagnostic problem and a diagnostic challenge for the people at

16   McLean because the substance use was at the forefront when, at

17   a minimum, they should have been side by side.

18          So he presents throughout the course of his life in

19   these sort of periodic periods of really intense depression,

20   intense drug use, that then buoyed by real contributions, going

21   to college, having a good job, working in art galleries.  He

22   was incredibly proud of the work that he did in the art

23   galleries.  He loved that job.  He loved being able to talk to

24   people who came into the gallery about the art that was on the

25   wall and help them understand its meaning.  He was enriched by

1    this, and he loved having that interaction with people about

2    the work, in the same way he loved caring for the Cooperman's

3    mother because he really was able to do things with her, both

4    medically but also musically and culturally.

5           He has all of those things.  He is all of those

6    things, and I believe that the Court can see all of that and be

7    able to craft an appropriate sentence that respects and honors

8    who he is besides this offense, look at the components of

9    mental illness and drug use and also see what is prison,

10   especially what we anticipate his prison experience is going to

11   be like, what is prison really going to do for him and also for

12   the victim.  And for those reasons, we're asking that the Court

13   impose a sentence of 60 months.

14          THE COURT:  Okay.  I think I want to talk to Dr.

15   Edersheim here, if Ms. Beatty can arrange that so that she can

16   be brought up on the screen or so that she can speak, I should

17   say.

18          DR. EDERSHEIM:  I'm here, Your Honor.  Would you like

19   me to be present on Zoom or leave my video off?

20          THE COURT:  It's really up to you.  It's better to

21   have a face as well as a voice, so if you can appear on the

22   screen, that would be helpful to me.

23          DR. EDERSHEIN:  The host has to allow me to appear on

24   the screen, but it has been beautifully managed thus far.

25          THE COURT:  Can that be done, Barbara?

1          DR. EDERSHEIM:  Good afternoon, Your Honor.

2          THE COURT:  Well, you have to appear on my screen so

3     that I'm not looking at -- I can look passed Ms. Beatty.  So

4     let me ask just a couple of questions that are more maybe even

5     preliminary questions.

6          I was taken with your report because it was measured

7     and not what I sometimes get, which is advocatory approaches as

8     opposed to recommendations, but in particular the determination

9     that you made that you ruled out diagnoses of major depressive

10    disorder and bipolar disorder.  And I tried to understand

11    precisely why you did that.  It seemed to me that you felt you

12    didn't have enough information to do it, but also lurking

13    underneath is a sense that this did not rise or descend to that

14    level of a major disorder, that the better way to describe this

15    is, as you've indicated, impulsive characteristics of

16    borderline personality disorder and a polysubstance use

17    disorder.  None of it is good but there are different

18    gradations, I suppose, in dealing with that.  The second is the

19    question of suicidal ideation which appears here to be

20    transitory but consistent over an extended period of time.

21         And I guess I would like you to talk about that in

22    light of your rule-outs of major disorders, what that means

23    under these circumstances, how I should evaluate that.

24         DR. EDERSHEIM:  Yes.  Your Honor, I don't want to be

25    long-winded, so interrupt me if I'm becoming long-winded.

1          Mr. Field was very frank with me and very open with me

2    during our interchanges, which is why I feel that I have some

3    diagnostic clarity here.  In our one-on-one interviews I was

4    able to put together a history of the sequence.  And by virtue

5    of my presence as a forensic psychiatrist, I could get records

6    that previous treaters couldn't and could put together a

7    longitudinal picture which is different from sporadic and

8    changing treatment programs.

9          I'm not ranking disorder in terms of severity, but I

10   think the best chance for Mr. Field to improve and to get

11   better is the correct diagnosis and the correct picture

12   distributed to all of his treaters and that he would have

13   treatment simultaneously.

14         So my issue with respect to the borderline personality

15   disorder diagnosis and substance abuse disorders, they are very

16   common.  It is an unfortunate combination, but it is a common

17   combination.  And the most important thing is that it's a

18   treatable combination.

19         So if I had diagnosed Mr. Field with something like a

20   frontal lobe disorder that caused him to be disinhibited, we

21   would have a real problem because the upside would be limited.

22   But for Mr. Field, these diagnoses are common.  They're often

23   comorbid, but they require state-of-the-art treatment

24   simultaneously.  And it's not unusual for people with a

25   combination of these two disorders to be impulsive, to be

1    volatile in terms of their emotionality.

2          Mr. Field is actually quite a shy person and a

3    contained person.  He sometimes feels very bad about himself

4    and very awkward, and I don't want to go into great detail in a

5    public hearing, but people often misunderstand him, and he gets

6    despairing, and he uses substances during his despair, and that

7    accelerates his impulsivity, and the suicidality comes in on

8    the heels of that.

9          He has a triad of being impulsive, using substances

10   and wanting to harm himself.  And this offense characteristic

11   really looks very much in keeping with that triad.  He

12   (technical difficulty) on himself, the accelerated

13   disinhibition with substances and made very poor decisions on

14   the way.  And as you read in my report, I didn't minimize those

15   poor decisions.  What was unusual was that he was making a poor

16   decision involving a third party, the victim.  Usually he

17   victimizes himself because he feels so bad about himself and so

18   ashamed.

19         So the treatment that he needs is intensive substance

20   use disorder treatment combined with personality disorder

21   treatment, which is actually a quite well-honed science.  We do

22   very well with it.  So the chronicity of the substance use

23   disorder will require treatment, but actually we do pretty well

24   with that, too.

25         We used to think that you treat the psychiatric

1  disorder second and the substance abuse disorder first.  When I

2  was a resident, we thought that.  But nobody thinks that

3  anymore.  That is ineffective treatment no matter who you ask.

4  So dual diagnosis means treat both simultaneously and with

5  state-of-the-art medication.

6         THE COURT:  So let me pause on this.  It's a question

7  that I raised with Ms. Thrall here, which is the reference to

8  the Department of Mental Health providing services.  I take it

9  that you've not actually directly communicated with Ms. Hovley

10 or any of her colleagues on this particular case?

11        DR. EDERSHEIM:  No, I have not.

12        THE COURT:  Would it be valuable for you to do so to

13 answer the following question, which is, is it realistic to

14 think that we can have state-of-the-art services here either

15 after five years, or more accurately, if there was an

16 acceptance of Ms. Thrall's view, another two plus years, for

17 Mr. Field?

18        DR. EDERSHEIM:  Well, I have not communicated with Ms.

19 Hovley, but I am very familiar with the Department of Mental

20 Health.  I trained here, I was a resident.  I've been in state

21 court, participated in state court cases.  I also actually deal

22 with the federal court system with respect to substance abuse

23 issues.  But it's very realistic in terms of what the

24 Department of Mental Health has to offer.

25        So with respect to adult substance abuse and dual

1    diagnosis services, they have everything one would need.  They

2    have respite beds.  They have residential treatment.  They have

3    recovery communities where, after one is stabilized and perhaps

4    discharged to -- not a living situation where he would be in

5    the custody of DMH, they would also follow him in a recovery

6    community, provide mental health services.

7          The Department of Mental Health in Massachusetts is of

8    course very advanced in its psychiatric treatment because

9    Massachusetts has a very high concentration of psychiatric care

10   and research, and so the care is quite good.  And they have

11   consultants.  They have psychiatric consultants for

12   simultaneous medication treatment.  And the most important

13   thing for Mr. Field is that he start treatment early and

14   continue.

15         THE COURT:  Okay.  So let me pause there, which is the

16   second dimension of it.  You are familiar with the Bureau of

17   Prisons or at least the federal system?

18         DR. EDERSHEIM:  Yes.

19         THE COURT:  And the likely classification of Mr. Field

20   to a facility, facilities that are perhaps more subject to

21   interruption in daily routine, penitentiaries or high security

22   operations, what's the impact of that on Mr. Field's recovery?

23         DR. EDERSHEIN:  The facilities, the federal facilities

24   which have RDAP programs are ideal for Mr. Field because he can

25   have comprehensive and somewhat segregated supported treatment.

1    Those programs are wonderful in terms of the wraparound

2    services.  They are comprehensive, meaning they offer groups.

3    They offer 12 Step programs.  They offer medication-assisted

4    treatment.  They offer psychiatric consultation for other

5    disorders.  So RDAP is really the ideal program for him.

6         I think Connecticut, New Jersey and Pennsylvania are

7    the closest ones, but there may be a Massachusetts facility

8    that I don't know of that has an RDAP.  I haven't looked for a

9    while.

10        THE COURT:  Let me just pause for a moment.  I'm

11   addressing this to the Probation Officer.  Ms. Fox, does Devens

12   have RDAP?

13        U.S. PROBATION:  I am not sure, Your Honor.

14        THE COURT:  I don't think so.  That's my view, so

15   we're really talk about Danbury or Fairton or maybe Berlin as

16   well.  That's probably the lowest security -- the highest

17   security operation that would have it, Fairton maybe.  I guess

18   it's not that I want to cut you off.  I wanted to get some

19   basic information from you, Ms. Edersheim.  I was going to ask

20   to hear from Mr. Field, but I'm not going to because I'm not

21   going to rule on this today.  I want more information.

22        And what I think I'm going to do is ask Probation to

23   communicate with the Bureau of Prisons to understand what his

24   likely designation is going to be and the availability of RDAP

25   programs in that likely designation at the outset and realistic

1   assessment of the interruptions that would take place in such a

2   facility.

3         I second would like from Probation some understanding

4   of the way in which they might interface with the Department of

5   Mental Health under those circumstances.  That may involve

6   outreach to Ms. Hovley and Dr. Edersheim as well.  I don't want

7   to take a lot of time on this.  I want to get to this next

8   week, if at all possible.

9         My point is this.  That having listened to all of this

10  and recognizing that it will be available to the victim and

11  this kind of back and forth in writing doesn't facilitate

12  immediate kind of assimilation, I know, that fashioning a

13  sentence in this setting necessarily will involve some complex

14  decisions about where the balance of these incommensurables is

15  going to be.  We certainly have the history.  Now I want to

16  understand what's the best way available for Mr. Field going

17  forward.

18        I do want to hear from him.  I will when I've got this

19  information.  But until I have that information, I don't want

20  to I think proceed further because I want him to have the

21  information and be able to assimilate it.

22        I've read the materials that he has.  He's self-aware,

23  but as Dr. Edersheim indicates, not to put it on her, that he's

24  impulsive in various ways, and there is a community

25  responsibility that I have of protecting the community as well.

1    That comes as specific deterrence.  And of course the question

2    of general deterrence that we've discussed here plays into it

3    as well.

4          But I want more information, I guess.  I've got a lot

5    of information.  We all understand we've got a lot of

6    information, more than virtually any case I've had on those

7    kinds of issues, but I want more to deal with that.

8          Ms. Fox, do you think that can be turned around fairly

9    quickly.

10          U.S. PROBATION:  I will do my best, Your Honor, yes.

11          THE COURT:  So we will try to set up a further hearing

12    in this case to take up these other matters here, and Dr.

13    Edersheim, you may be getting phone calls from people about

14    various matters, but I think I know enough from what you've

15    told me of what the real universe of considerations are that I

16    should have in front of me.  It's one thing to have the

17    universe.  Now I've got to talk about boots on the ground.

18          DR. EDERSHEIM:  Yes, I would be happy to be of any

19    help I can, Your Honor.

20          THE COURT:  I appreciate it very much.  And as I said,

21    I was very impressed with the report that you gave mainly

22    because -- well, not mainly, it was well-formed and so on, but

23    because it was well-balanced and it seemed to me to be a

24    careful consideration of the materials that were available to

25    you in drawing conclusions that are hard to draw, kind of like

1    what I have to do for a living.  So I perhaps share the pain in

2    doing that kind of thing, but that was very helpful to me in

3    this.  So anything else that we should take up right now?

4            MS. THRALL:  Your Honor, first I will generate an

5    email between myself, Ms. Fox, Dr. Edersheim and Ms. Hovley so

6    that everyone can talk to each other.

7            THE COURT:  Right.  And make Ms. Paruti aware of this.

8    I'm not asking her to sign in or buy in or anything like that,

9    but I do want you to be aware of what the communications are

10   because we'll have a further discussion about what I might do

11   in this case.

12           MS. THRALL:  I will absolutely add the government as

13   well.  One request I have of Probation is, when we have the

14   consultation with the Bureau of Prisons about the points, if

15   it's possible to ask whether the open case -- where the open

16   case takes us.

17           THE COURT:  Okay.  Well, if they can fine-tune it to

18   that extent, my experience with the Bureau of Prisons is that

19   they tend to be a little more formulaic in their response and

20   kind of less than tailored, but we'll see what we can do.

21   Ms. Paruti, I'm sorry.

22           MS. PARUTI:  Could I just ask one clarification?

23           THE COURT:  Sure.

24           MS. PARUTI:  To the extent that there is substantive

25   information that is made available to me about the

1    communications with Dr. Edersheim and the DMH caseworker and

2    Probation, I just want to be clear about what of that I may

3    share with the victim in advance of any future hearing.

4    Typically I would not share any information that's not part of

5    a public record.

6              THE COURT:  I think you have to view this as part of

7    the public record.

8              MS. PARUTI:  Thank you.

9              THE COURT:  Here, maybe Ms. Thrall disagrees about

10   that, but Dr. Edersheim has the full disclosures throughout her

11   report, and Mr. Field and others who are informants were put on

12   notice that what they said may be disclosed at some point to

13   adverse parties, treating you as an adverse party in this

14   setting.

15             MS. PARUTI:  I understand.

16             THE COURT:  So it's available to you.

17             MS. THRALL:  I have no objection to that.  The

18   government had asked for permission for anything that was

19   sealed to be shared with the victim, and I think I crafted the

20   motion to seal so that he could have everything.

21             THE COURT:  Okay.  And I think it's important for the

22   victim to have this.  I mean, you know, it is clearly

23   thoughtful in the way in which he's dealt with these things,

24   and it is a journey for a victim as well as for a perpetrator

25   when we're talking about matters like this.  So he clearly is

1    someone who is able to synthesize this information and provide

2    a meaningful and reliable response from his own perspective on

3    this.

4         MS. PARUTI:  Thank you.

5         THE COURT:  I would appreciate it.  And I would

6    communicate one other thing.  I realize he's said that he did

7    not want to be here, and I understand that fully, but you might

8    communicate to him that there are various tailored ways that

9    that can be done, including not appearing on the screen, and of

10   course I have not mentioned his name in any way, although I

11   think it's had some salience otherwise.

12        MS. PARUTI:  I appreciate that sentiment.  I think I

13   have some level of confidence that -- I should say I have every

14   level of confidence that that would have been explained to him

15   by the victim specialist who has been working with him for the

16   past couple of years, but I will reiterate that.  And I think

17   he may change his mind, given the sort of trajectory of where

18   we're going, so I appreciate that.

19        THE COURT:  No.  I think someone who has been subject

20   to that kind of experience would be more than twice shy.  On

21   the other hand, he also reflects someone who has thought about

22   this a lot, and the vignettes are quite striking to me and very

23   telling about his experience, but they are reflective of the

24   immediate aftermath of the events rather than as he reflects on

25   it more and has had interactions with the defendant.

1          MS. PARUTI:  Thank you.

2          THE COURT:  Admittedly, extended -- extended in the

3    sense of attenuated interactions of the defendant.

4          MS. PARUTI:  I understand.  Thank you.

5          THE COURT:  Okay.  All right.  If there's nothing

6    further, we will be in recess, and we will try to set this down

7    if we can next week, but we'll do it in a way that permits

8    everyone who is interested to be present.

9          MS. THRALL:  I just didn't know if we were going to

10   select the date now.

11         THE COURT:  No, I'm not.  I'm going to leave it up to

12   Ms. Beatty to address it with the parties.  We will be in

13   recess.

14              (Adjourned, 4:48 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3            I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                    Dated this 7th day of September, 2021.

10

11            /s/ Kelly Mortellite

12            _____

13            Kelly Mortellite, RMR, CRR

14            Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25