UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal Action |
| Plaintiff, | ) | No. 19-10107-DPW |
| | ) | |
| v. | ) | |
| | ) | |
| JULIAN FIELD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

BEFORE THE HONORABLE DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE

SENTENCING

June 2, 2021

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

On Behalf of the Government:
Anne Paruti
United States Attorney's Office MA
1 Courthouse Way
Suite 9200
Boston, MA 02210
617-748-3310
anne.paruti.lohnes@usdoj.gov


On Behalf of the Defendant:
Jessica P. Thrall
Federal Public Defender Office
51 Sleeper Street, 5th Flr.
Boston, MA 02110
617-223-8061
Jessica_Thrall@fd.org

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Douglas P. Woodlock, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, One Courthouse Way, Courtroom 1, Boston, Massachusetts, on June 2, 2021.)

(Case called to order.)

THE COURT:  So one housekeeping matter is that my view is that anyone who is fully vaccinated need not wear a mask. They can but they need not wear a mask.  Those who prefer to wear a mark, that's fine as well.  And those who are not vaccinated should, I think, wear a mask.

So let me turn to the more recent material.  I want to be sure that everybody has what I have received, the very helpful memorandum from Ms. Fox with two attachments sent by email to Ms. Beatty yesterday, and I think both sides were provided with copies of that.  And that I think is all I've received.  Is that right?

MS. PARUTI:  I had filed on the public docket the statement that the Court had directed me to file, which I had read into the record at our first portion of the sentencing hearing.

THE COURT:  Right.  But that was already before me. Anything else?

1          MS. THRALL:  No, we did not file anything additional.

2          THE COURT:  Okay.  So I did anticipate anyway that Dr.

3     Edersheim would be present.  Is she?

4          MS. THRALL:  Yes, my understanding is she has logged

5     on.

6          THE COURT:  Okay.  I think there is a matter that I

7     want to discuss with her in the presence of counsel.

8          MS. THRALL:  Yes, Your Honor.  I'm happy to do that

9     with Dr. Edersheim.  One issue that she and I debriefed on

10    after the conclusion of our last hearing was, if there was a

11    way in which she on Zoom could be in a separate breakout room

12    from the general public to the extent that she's going to

13    discuss Mr. Field's psychiatric condition, where it would be on

14    the public record here in front of the parties, but if she can

15    be in a breakout room so that the people in the audience on

16    Zoom wouldn't necessarily have access to HIPAA protected

17    material.

18    (SEALED PORTION REMOVED FROM TRANSCRIPT.)

19         THE COURT:  Okay.  So having spent a little bit of

20    time going more deeply into a certain medical discussion that

21    would in the ordinary course compromise the defendant's privacy

22    and confidentiality interests, I think we can go back on the

23    record.

24         Ms. Thrall, let me understand precisely what you think

25    the judgment should look like here, words that the judgment

should have, that sort of thing.  I'm of the view that I have a variety of different things that I have to do, obviously, not the least of them being to vindicate public interest and avoiding violence or threats of violence.  And that obviously argues for a longer period of incarceration.

But I want to provide as best I can a seamless ideal that Dr. Edersheim was identifying, so maybe you can address that.  And part of it is recognizing, as I do, that there are relapses and there are relapses and relapses.  We have to look no farther than the experience of the defendant to see that.  The question is how a Court can effectively, in this regime, can effectively minimize the impacts and continue the positive trajectory.

MS. THRALL:  Thank you, Your Honor.  What I believe has been the goal of a lot of your questions both for Probation and for Dr. Edersheim is to fashion special conditions of supervision for Mr. Field upon his release so that --

THE COURT:  Two parts.  The second part -- I'm sorry to interrupt, but not the second part.  The first part is encouraging the Bureau of Prisons to do what they can do under these circumstances.

I've looked of course at the location of the facilities that can provide a residential treatment program.  I would of course recommend that it be addressed in dual diagnosis, and I think they're doing that now.  The Bureau of

1  Prisons is, like a lot of institutions now, under some stress,

2  now though coming out of it.  But they declined to provide me

3  with all of the information I want, which is where are you

4  going to designate him and what certainty do I have that you

5  will designate him, but I can make the recommendations and

6  follow up on them and I will.

7         MS. THRALL:  And I think, I mean, I understand also

8  that the Court would agree that the judgment should direct the

9  Bureau of Prisons to identify a prison for Mr. Field that has

10 the RDAP program.  I think that everyone would agree that

11 that's something appropriate to include in the judgment.

12        I also think to the extent that there is any slim hope

13 that he could ever be sort of classified down to be at a

14 federal medical center --

15        THE COURT:  Well, see --

16        MS. THRALL:  I don't see that as realistic.

17        THE COURT:  I'm not sure that I'd think that after

18 Ms. Fox's inquiry.  They, resolutely, Bureau of Prisons says

19 that they make the designation not necessarily in lockstep with

20 classification.

21        Now, that hasn't been my experience.  I'm sure it

22 hasn't been yours.  But that's what they say, and that's what

23 they'll be held to.

24        MS. THRALL:  Sure.  And I reviewed the submission from

25 Ms. Fox, and there's nothing wrong or necessarily incorrect

1  with what the Bureau of Prisons wrote in their response.

2      The issue is it did not, in my view, specifically

3  focus on Mr. Field and on his particular classification points.

4  It speaks more in generalities about what they could or could

5  not do.  And I agree they could put someone at a federal

6  medical center, but as you just said, our collective experience

7  is that that is very unlikely to happen.  And so to the

8  extent --

9      THE COURT:  But the RDAP programs are not just at the

10  federal medical center.  In fact, you know, we have a federal

11  medical center here in the District of Massachusetts, but it's

12  not one that has an RDAP program.

13      MS. THRALL:  Yes.

14      THE COURT:  So it can go anywhere from Canaan, which

15  is a penitentiary, through aspects of Lewisburg, which also is

16  a penitentiary but they don't have the RDAP in the

17  penitentiaries as near as I can see, down to prison camps.  And

18  it's that program that we're really trying to capture, and the

19  program is not exclusive to the medical centers.

20      MS. THRALL:  Right.  And I think that sometimes,

21  because of the specialties within the federal medical centers,

22  they don't have RDAP because they have those other treatment

23  programs.

24      THE COURT:  Right.

25      MS. THRALL:  So, for example, one alternative could be

FCI Cumberland.  I believe they have RDAP, and it's not such a low designation that I think would be -- it is still an FCI, so I think with some realistic hope with the other calculations that's maybe a compromise, an FCI that has an RDAP program in it.

So to the extent you're asking me how do I want you to write the judgment, I would like the judgment to be written to include a residential drug treatment program, an RDAP program, as close to home as possible.

THE COURT:  Why is that a necessity here?  And that in fact raises another question of perhaps it's contraindicated in this setting.

MS. THRALL:  Your Honor, I think that from what the Court can see of Mr. Field's tremendous support system, the more that Mr. Field has the ability to interact with those people, which includes his sponsors from AA, which includes his mother, which includes the really wonderful people who he has in his corner, the more he is able to have real contact with them during the course of his incarceration, the stronger those relationships will be upon his release.  That's just one factor.  I'm not saying it's necessarily a greater factor than a dual diagnosis program that the Bureau of Prisons could offer.  If that was in Texas, the Court may very reasonably say it's more important for Mr. Field to be in the best possible detention treatment available even though it's far from home.

1          But to the extent that we're talking about all of the

2     factors that Mr. Field is going to experience during his

3     incarceration, the ability to maintain his social network like

4     Dr. Edersheim was talking about, about that safety net of the

5     people who, if or when he relapses --

6          THE COURT:  Okay.  So let me just put this another

7     way, which is, I will welcome language to implement that view

8     as to the recommendation.  Of course I will adapt it as I think

9     necessary here.

10          The important thing for me is an intensive treatment

11     program that's not interrupted, and fitful contacts I'm not

12     sure necessarily serve that purpose.  It's absolutely the case

13     that coming back into the community that will be very valuable,

14     not so obvious that they will be valuable or helpful during the

15     period of incarceration.  And I have in mind of course the

16     prelude to the crime involved here, which involved a form of

17     battery that the social network didn't adequately provide

18     against.

19          MS. THRALL:  Yes, yes, and I think one of the things

20     that has developed over the year or so since Mr. Field's arrest

21     is a very public display of the extent of Mr. Field's mental

22     health needs and substance use needs.

23          The Court, I'm sure from prior experiences, can

24     understand the shame and desire to keep those issues under

25     wraps within a family, and now, not just through this

sentencing proceeding but certainly this is a very obvious
example, there are no secrets.

And for Mr. Field's community to much better
understand what he is struggling with, what his future needs
will be, it becomes so much easier to reach out for help than
it was before in February of 2019 when there was still a
desire, a necessity to keep an image that everything was fine.
And now there's no more necessity for that because everyone
knows that Julian needs a lot of help.  And what has been so
moving for me to get to know his community is how ready,
willing and able all of these people are to be on this path
with him moving forward.

THE COURT:  All right.

MS. THRALL:  So the other half of the way that I
understand your question is not just structuring the judgment
but also structuring the special conditions.

THE COURT:  Yes.

MS. THRALL:  And what I am hoping is that the
Probation Department can work with the Court to structure these
special conditions that include exactly what we've been talking
about.

THE COURT:  Well, exactly what you've been talking
about, without expressing too much frustration, is put it in
writing.

MS. THRALL:  Sure.

1  THE COURT:  I mean, not narrative, not an argument but

2  a particular form of writing:  Here is what we would like that

3  judgment to look like here.  And of course I will discuss and

4  get comments from the Probation Office and from the government,

5  and of course I'll do my own.  But I think what I am

6  anticipating is that it will be to some degree an iterative

7  process, that is to say you make a submission, Ms. Paruti, if

8  she wishes to, makes a submission, although I think probably

9  the first form of it should be yours, and then we'll get

10  comments by Probation, by the government, and I'll indicate my

11  tentative views about it before finally deciding how we do it.

12  MS. THRALL:  And what I would imagine doing, Your

13  Honor, is effectively bullet points of exactly what special

14  conditions we would be requesting, and I'm happy to do that in

15  collaboration.  Certainly I'm happy to write the first draft,

16  but I would probably talk to Probation before I --

17  THE COURT:  Yes, I think that's the best way to do it.

18  MS. THRALL:  This is also -- this also connects with

19  another topic that I wanted to raise with the Court related to

20  the issuance of the judgment and the finalization of the

21  Presentence Report, which is that whenever the Court announces

22  the sentence, that we hold off on the issuance of the judgment

23  and the issuance of the final PSR so that we can have feedback

24  from the Concord District Court about whether or not they are

25  going to dismiss the final pending charge that Mr. Field has.

1      It's very important to me that the version of the
2  Presentence Report contains the accurate up-to-date information
3  from Concord so that if they are going to dismiss the case, and
4  I'm not sure they are, but if they do, I want that to precede
5  Mr. Field's arrival.
6          THE COURT:  I understand the Alphonse and Gaston
7  quality of that having had to deal with the Bureau of Prisons
8  as well who has a certain similarity to what you're talking
9  about in the Concord District Court, but I think it has to be
10 brought to conclusion promptly.
11         MS. THRALL:  Yes.
12         THE COURT:  And I'm perfectly prepared to say
13 something along the lines of, This is the judgment that will
14 enter within five days in the absence of some extraordinary
15 circumstance consistent with what we've discussed here.
16         MS. THRALL:  I was going to suggest something very
17 similar.
18         THE COURT:  Okay, whatever you say, but it can't go
19 longer than a week, and we really have to bring it to a
20 conclusion here.  And my own understanding is that even post
21 hoc changes in outstanding state cases are absorbed by the
22 Bureau of Prisons in making their judgments.
23         MS. THRALL:  They are absorbed.  My experience,
24 including a recent case also with Your Honor, is that
25 absorption process is very difficult and takes a lot of effort

1   from the state court offices.  So I agree they can be absorbed.

2   I'm trying to avoid --

3            THE COURT:  Okay.  So what we have then is the

4   structure, which is, I can give a basic structure of what I'm

5   going to do, and then we'll work at incorporating that in

6   specific language that will be the presumptive written judgment

7   to be entered.  It won't be entered for seven days, and it will

8   be available for you to provide, but it will be entered after

9   the seven days.

10           MS. THRALL:  That's fine.  Thank you.

11           THE COURT:  Okay.  Ms. Paruti, do you have anything

12  further that you want to offer with respect to this?

13           MS. PARUTI:  No.  Thank you.

14           THE COURT:  Okay.  And Mr. Field, anything further

15  that you'd like to say at this point?

16           MS. THRALL:  He does want to address the Court, Your

17  Honor.

18           THE COURT:  All right.

19           THE DEFENDANT:  Thank you, Your Honor.  Thank you for

20  this opportunity to share some thoughts on everything that I

21  did to bring us here today.

22           First, I'd just like to apologize to the victims in

23  this crime, to the victim who isn't here today but is most

24  certainly in my thoughts, and to my mom who is here today.  I

25  am so sorry for the trauma that I have put you through.  And to

everyone who can hear my words right now, you, a member of my greater community or a close loved one, I am so sorry for all the shock and the disappointment and the pain that I have caused.

My actions on February of 2019 comprise the worst thing that I have ever done.  And honestly, my biggest goal in life right now is to ensure that that never happens ever again.  And to that end, I have reached out for support and guidance from all resources that are available to me.  I have implemented numerous daily practices to stay focused on that goal.

Having set out on this path over a year ago now, I actually feel for the first time in my adult life a sense of hope that when I do rejoin society, I'll be able to lead a healthy and fulfilling life.  But most importantly, I know that in building upon everything that I've been doing, I know that I can and I know that I will achieve that goal of never coming close to repeating what I did two years ago.

I just want to say to everyone who has come here in person or via Zoom, thank you so much.  Your support means more to me than you could possibly know.  And I appreciate you giving me this time, Your Honor, to speak.

THE COURT:  Thank you.

So we've had a very extensive discussion here.  I've thought a great deal about this, and I have received a great

1    deal of helpful information, some of it making clear to me the

2    limitations that I face in sentencing under these

3    circumstances.  It's not so much limitations of the sense of

4    authority to choose a different path than the ones the parties

5    have set out or at least the guardrails in the plea agreement

6    that the parties have set out or, more accurately, their mutual

7    positions, but I go back to where I was before.

8           There are two parts of this.  And one part is the one

9    that Mr. Field has spoken to here, which is a very serious

10   crime of a type that, when unaffected by the mental health

11   concerns that Mr. Field confronts, would justify a much higher

12   sentence than either of the parties have suggested to me,

13   necessary for the traditional reasons of sentencing as a form

14   of retribution, affirmation of the community's view of what's

15   important and what needs to be protected, concern that it not

16   be repeated either by Mr. Field or anybody else in the form of

17   general deterrence and in the context of the sentencing

18   guidelines that there not be unwarranted disparities among

19   offenders.

20          But Mr. Field is a separate person with demons and

21   challenges that he has faced throughout his life, and they have

22   affected in various ways the actions that he has been

23   undertaking.  I very much appreciate, as I had indicated, Dr.

24   Edersheim's views and the balance that she brings to it,

25   although obviously from the perspective of a mental health

professional, and it has informed my views.

But I look at what's available to me, and what's available to me prospectively is at best a slow but steady form of addressing these problems in an intensive way that is most readily available through the residential drug treatment program, residential treatment program provided by the Bureau of Prisons. That in turn requires a certain amount of time in prison. I'm not making that determination on that basis, just recognizing what is available to me. And of course the residential drug treatment program may have incidental benefits of speedy resolution of the incarcerative dimension to the program for him.

The recommendation of five years seems to me to be appropriate, 60 months' incarceration. That's the recommendation of the defendant. I don't view it as a kind of effort to strike a balance without understanding as well the needs for incarceration on the part of the defendant. I wouldn't go below it here. I think it's about right. I understand the government's view about this, but I think it's too woodenly adhering to the guidelines without adequate consideration of why it is that the guidelines can be varied from.

But as Dr. Edersheim would say, that is then. We're concerned about now. And the now is an opportunity for a very intensive program that will be developed with specific language

1  that we will all address and that will seamlessly, I hope, tie

2  together with a program by the Department of Mental Health,

3  picking up and underscoring the needs that the defendant has.

4      I certainly recognize the problem that Dr. Edersheim

5  has identified, that is the lapse and relapse problem, although

6  we've already had that, and now we have a defendant who has

7  been forced to bring even greater insight into the harm that

8  his actions can cause.  And that greater insight, I hope, will

9  lead to a recognition that is internalized that every day he

10  gets up in the morning and he has this problem.  That's the

11  beginning of the 12 Step programs, and it's the beginning of

12  wisdom in this.  As Dr. Edersheim said, this is a lifetime

13  activity.

14      So the judgment will include a recommendation that the

15  defendant participate in a dual diagnosis program in the Bureau

16  of Prisons, which is effectively administered I believe by the

17  residential treatment program as intensive as possible, and of

18  course that involves careful evaluation of the medications that

19  the defendant is taking to address his mental health problems

20  and of course also limiting his access to substances that would

21  otherwise provide opportunities for abuse.

22      I would, to the degree possible and in the absence of

23  the residential drug treatment program, ask the Bureau of

24  Prisons also to consider an alternative community placement

25  program here.  That seems to be less desirable but better than

1   nothing under these circumstances.

2          The question of where this takes place is, it seems to

3   me, something that I'll reference in the most general way.

4   There are a number of locations at which the residential drug

5   treatment program is provided, from penitentiaries down to very

6   low security settings, prison camps.  The communication,

7   somewhat open-textured, by the Bureau of Prisons to Ms. Fox is

8   that they do not have categorical response to that.  I hope

9   that's right.  Certainly it's not the proper response, tailored

10  response to this setting.

11         But more important to me is the issue of when the

12  defendant comes back into the community.  It is absolutely the

13  case that these letters indicate that there is a rich network

14  of people who are prepared to provide support.  The defendant

15  professes to welcome that support.  I say "professes" because

16  every day he's going to have to prove it when he comes out.

17  But I believe him when he says that that's his settled goal

18  from which he will not be dislodged.  But we'll put in place

19  the kinds of programs, both substance abuse and mental health,

20  referred to now as dual diagnosis, as seen best designed to

21  assist him.

22         And all the work that Ms. Thrall has done in this case

23  to date indicates that the Department of Mental Health is

24  prepared to provide that and stands ready and willing in ways

25  that are not just acknowledging their mandate but ready and

1  willing in the investment of time that they've spent in

2  thinking about this case to do precisely that.  So I expect

3  that that will be done and will be incorporated in the form

4  that we have for the judgment in this case.

5          I will impose the longest period of supervised release

6  I can, which is five years.  It's absolutely true that this is

7  a long-term activity, and it requires commitment that's

8  continuous.  And to the degree that the Court can foster it and

9  provide support for it and provide a mechanism to encourage it,

10  I mean to do that as long as I can.

11          In all of this, there is this issue that I alluded to

12  in talking to Dr. Edersheim about personal autonomy, the right

13  of someone to make his or her own choice about their lives, his

14  life.  I think that's true.  There is a point at which the

15  Court cannot or should not continue because the defendant

16  himself is going to have to continue.  And ultimately this

17  depends upon him.  Ultimately it depends upon his exercise of

18  his free will in a positive way.  But all of us want to be

19  assured that we have done everything possible to make it as

20  certain as it can be that the defendant will follow through,

21  and that's what this is all set up to be.

22          There is a special assessment of $100, which of course

23  I impose here.  It's mandatory.  I will not impose a fine.

24  That's the least helpful I think aspect of this sentence for

25  this defendant.  And of course because of the problems of

1   moving back and forth between the state and federal system and

2   particularly to encourage the prompt resolution of the case in

3   the Concord court, I will, as was requested, when we get a

4   final version of this, which I hope to be able to do in a week

5   or so, and the laboring oar will be with Ms. Thrall and work

6   with Ms. Fox and certainly consult with Ms. Paruti as well

7   ahead of time, you'll get a draft.  We'll have a comment on the

8   draft, and then I'll say this is what it is, and it will be

9   issued in seven days, delaying the execution so that you can go

10  back into the Concord District Court and say, Here is what's

11  going to happen, we think it's sufficient, and it's an

12  improvident use of the state resources to continue that

13  prosecution.

14       This is, as I've indicated at the outset and will

15  indicate again, it's a very difficult sentencing process

16  because it creates such conflict between the multiple goals of

17  sentencing, which as I've said I've divided into historical and

18  prospective.  But how you treat the historical and how you

19  treat the prospective is further complicated by the factors

20  that I must consider.

21       This strikes me as the best possible balance available

22  to me to serve all of those purposes, and for that reason I

23  impose it.

24       And I will tell Mr. Field, as I tell every defendant,

25  virtually every defendant, that he has a right of appeal once

1  the judgment issues.  He'll want to consult with counsel

2  whether it makes any sense to do that, because I go back to a

3  point that I think I've made earlier here, which is that

4  everybody makes mistakes, even sentencing judges, and those

5  mistakes ought to be subject to transparent evaluation by the

6  people who are affected by them or concerned with them.

7        And that is done, at least through the ordinary

8  process of the criminal justice system, by appeal, but it also

9  is a reflection of what Mr. Field is I believe confronting now

10  with real insight, which is an incredible mistake, that's an

11  understand statement of what it was, to have engaged in the

12  kind of activity that he did, and his obligation to himself and

13  to the people who have shown such support for him and to his

14  larger community to make good by following through on the

15  program that we've outlined here.  If you do, we're all better

16  off.  If we don't, none of us is.  But ultimately it's going to

17  rest on your shoulders, Mr. Field.

18        Now, that's the oral statement.  I think it comprises

19  everything that is contemplated here with the recognition that

20  it will be refined with particular language so that we've all

21  done all we can do to the addressees of this judgment in this

22  case.

23        Is there anything further that we need to take up now?

24        MS. PARUTI:  No, not from my perspective.

25        THE COURT:  So by next Monday I hope to have the

1  proposed conditions that can be incorporated.

2          MS. THRALL:  Yes.

3          THE COURT:  Okay.  All right.  That's after sharing

4  with Probation so they have their input on it as well.

5          MS. THRALL:  Thank you.

6          THE COURT:  Okay.  All right.  Mr. Field, it's a

7  little bit much to say good luck.  It's more than luck.  Luck

8  favors the prepared mind.  You've been preparing your mind.

9  Now is the time to see whether or not you can make that luck

10  come true.

11          THE DEFENDANT:  Thank you, Your Honor.

12          THE COURT:  Thank you.  We will be in recess.

13          (Adjourned, 12:54 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that the foregoing transcript is a true and correct

 7    transcript of the stenographically reported proceedings held in

 8    the above-entitled matter to the best of my skill and ability.

 9                        Dated this 7th day of September, 2021.

10

11                        /s/ Kelly Mortellite

12                        _____

13                        Kelly Mortellite, RMR, CRR

14                        Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```